UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WENDY CHLADNI, | : | |
|            Plaintiff, | : | |
| | : | |
| v. | : | No. 5:15-cv-4453 |
| | : | |
| UNIVERSITY OF PHOENIX, INC., | : | |
|            Defendant. | : | |

**MEMORANDUM**
**Defendant's Motion for Summary Judgment, ECF No. 22 – Denied**

**Joseph F. Leeson, Jr.**                                                                                        **November 7, 2016**
**United States District Judge**

**I.**   **INTRODUCTION**

Plaintiff, Wendi Chladni, complains of repeated autodialed calls from Defendant, the University of Phoenix, Inc., to her cell phone. This case is brought under the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. The University has filed a Motion for Summary Judgment, asserting that there is no genuine issue of material fact that Chladni consented to receive the calls and that once she revoked that consent, the University stopped calling her.

The Court finds that there are genuine issues of material fact as to whether the University contacted Chladni prior to receiving express consent. The Motion for Summary Judgment is denied.

**II.**   **FACTUAL BACKGROUND**

Chladni alleges that between May and June 2015, the University placed multiple calls to her cellular telephone number using an automatic dialing system. Compl. ¶¶ 14-15, ECF No. 1.

1

Chladni asserts that even after she advised the University to stop calling, it continued to call her cell phone as frequently as five to six times a day. *Id.* ¶¶ 12-13, 18-19; Chladni Dep. 45:4-11, ECF No. 22-4 (containing a copy of Chladni's telephone records for May and June 2015). According to the Complaint, she never provided the University with her cell phone number and never gave the University permission to call her. Compl. ¶¶ 12-13.

The undisputed facts show that on June 22, 2015, Chladni submitted an online job application to the University. Def.'s Stmt. Facts ¶ 1, ECF No. 22-3, *admitted in* Chladni's Stmt. Facts ¶ 1, ECF No. 23-3. When she submitted her application, Chladni provided her name, address, and cell phone number and checked a box indicating that she consented[1] to being contacted by the University. *Id.* ¶¶ 6-7; Chladni's Dep. 33:12-37:15. The language of the consent stated:

> By submitting this form, you are giving your express written consent for University of Phoenix to contact you regarding our educational programs and services using email, telephone or text – including our use of automated technology for calls or texts to any wireless number you provide. This consent is not required to purchase goods or services and you may always call us directly at 866-766-0766.

Def.'s Stmt. Facts ¶ 7; Rigler Decl. ¶ 6, ECF No. 22-5; Chladni Dep. 34:6 - 37:23.

Dustin Rigler, the University's Vice-President of Reporting and Analytics Services, attested that after the University received consent, it called Chladni on eight occasions between June 22 and June 24, 2015, from a single telephone number, and that it did not call her again after she contacted the University on June 24, 2015, at 4:15 p.m. and said "stop calling me." *Id.* ¶¶ 9, 15-16; Rigler Decl. ¶ 10.

---

[1]    Chladni alleges that she was forced to check this box to submit her application and whether it constituted "consent" is a conclusion of law, which she need not admit nor deny. Pl.'s Stmt Facts ¶ 6. As will be explained below, this Court finds that she did consent.

In contrast, Chladni testified at her deposition that the University first starting calling her in May 2015, before she submitted her online application, and proceeded to call her cell phone an average of five to six times a day, from more than one telephone number, until the end of June 2015. Chladni's Stmt. Facts ¶¶ 9-14, 23, 27; Chladni's Dep. 45:4-22, 69:16-71:22. She testified that she first informed the University to stop calling her in early May 2015, Chladni's Dep. 47:16-23, but the calls continued. While Chladni testified at her deposition that the calls continued even after she spoke with the University on June 24, 2015, *see id.* at 69:3-20, she admitted in her Response to Defendant's Statement of Facts that the University did not call her after June 24, 2015, *see* Def.'s Stmt. Facts ¶ 16, *admitted in* Chladni's Stmt. Facts ¶ 16.

### III. STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence might affect the outcome of the case under applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 257.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made,

the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

When the version of events offered by the party moving for summary judgment differ substantially from the non-moving party's version, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); Fed. R. Civ. P. 56(c). But, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

**IV.   ANALYSIS**

    **A.   The Telephone Consumer Protection Act and the Issue of Prior Express Consent**

The TCPA makes it unlawful for any person within the United States to make any call using an automatic telephone dialing system to any telephone number assigned to a cellular telephone service without the prior express consent of the called party. 47 U.S.C. § 227(b)(1)(A)(iii). In defining "prior express consent," the FCC stated that "persons who

knowingly release[2] their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 7 FCC Rcd. 8752, 8769 ¶ 31 (Oct. 16, 1992).  Although the TCPA is silent as to which party carries the burden of proving prior express consent, the FCC held in a declaratory ruling that the caller was responsible for demonstrating that the called party provided prior express consent, *see* In re Rules Implementing the Tel. Consumer Prot. Act of 1991, 23 FCC Rcd. 559, 565 (Dec. 28, 2007), and the courts generally have also placed the burden of proof on the caller, *see, e.g. Evankavitch v. Green Tree Servicing, LLC*, 793 F.3d 355, 366 (3d Cir. 2015) (reasoning that "the caller is in the best position to generate and maintain records of those communications").  The consumer may revoke consent under the TCPA.  *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013).

The University argues that the evidence shows that on June 22, 2015, Chladni provided express consent to receive autodialed calls, by checking the appropriate box when she submitted her application online, that it only placed calls after receiving such consent, and that it stopped calling her once she revoked consent three days later, which is not a violation of the TCPA.  In support, the University submitted declarations and business records reflecting all of its calls to Chladni, as well as her own telephone records from May and June 2015.  The University asserts that Chladni has offered no evidence to contradict this evidence, and that summary judgment should be awarded in its favor.

---

[2]   "[A]n individual may indirectly provide a third party with express consent to be called under the TCPA", *Olney v. Job.com*, No. 1:12-cv-01724, 2014 U.S. Dist. LEXIS 152140, at *34-35 n.4 (E.D. Cal. Oct. 24, 2014).  Additionally, prior express consent may be obtained via a website form.  In re Rules & Regulations Implementing the Tel. CPA of 1991, 27 FCC Rcd. 1830, 1844 ¶ 34 (Feb. 15, 2012) (hereinafter 2012 FCC Order).

B.     **On June 22, 2015, Chladni gave "prior express consent" to receive autodialed calls from the University.**

It is undisputed that on June 22, 2015, when Chladni submitted a job application online, she checked a box indicating that she consented to receive telephone calls from the University. Chladni's Dep. 33:14-37:15. Chladni contends, however, that she "had to check that box" and that she did not want to check it. *Id.* at 34:8-35:5. Regardless of whether or not Chladni felt that she "had to check" the box, she was not forced to submit a job application online. Her decision to take advantage of the website's services and to check the box was voluntary. *See Schwartz-Earp v. Advanced Call Ctr. Techs., LLC*, No. 15-cv-01582, 2016 U.S. Dist. LEXIS 30319, at *18-20 (N.D. Cal. Mar. 9, 2016) (concluding that the plaintiff's act of providing her cell phone number when she applied for a credit card was a voluntary act because she was not forced to obtain the credit card). There is no evidence that Chladni was coerced or tricked into checking the box, and the language of the consent was short and clear. *See Haysbert v. Navient Solutions, Inc.*, No. CV 15-4144, 2016 U.S. Dist. LEXIS 30720, at *25 (C.D. Cal. Mar. 8, 2016) (rejecting, with "little trouble," the plaintiff's argument[3] that the website's terms were unenforceable as a contract of adhesion, and finding that the terms were "short, straightforward, and unambiguous" and that there was no evidence that the plaintiff was "coerced, rushed, bullied, or tricked into submitting his phone number"). The terms of the consent, which Chladni had the ability to revoke as evidenced by her decision only three days later, are enforceable and constitute prior express consent under the TCPA. *See id.* at *26-27 (finding that the defendant's website terms, "were not unduly harsh, oppressive, or unfair because [the p]laintiff could easily undue [sic]

---

[3]     The plaintiff alleged that his prior express consent was not voluntary because the defendant's website required him to enter his phone number on forms he submitted online regarding his student loans, which included language either on the website or the submitted forms stating that he authorized the lender to contact him using automated telephone dialing equipment. *Haysbert*, 2016 U.S. Dist. LEXIS 30720, at *2-6, 23-24.

them" by revoking consent and therefore counted as prior express consent for the defendant to call him using an automated dialing system).

Chladni also attempts to invalidate her consent by arguing that her agreement to receive autodialed calls was made a condition of purchasing *or obtaining* a good or service. However, the FCC Rules and cases Chladni cites to support this position state only that prior express consent cannot be conditioned on "purchasing" any good or service. *See Lennartson v. Papa Murphy's Holdings, Inc.*, 2016 U.S. Dist. LEXIS 725, at *7-9 (W.D. Wash. Jan. 5, 2016); In re Rules & Regulations Implementing the TCP Act of 1991 et al., 30 FCC Rcd. 7961, 8013-16 (June 18, 2015); 16 C.F.R. § 310.4(b)(1)(v)(A)(ii); 2012 FCC Order, 27 FCC Rcd. at 1844, 1863. There is no allegation that Chladni's consent was obtained while making a purchase from the University. In fact, the language in the consent expressly advised Chladni that "[t]his consent is not required to purchase goods or services." *See* Def.'s Stmt. Facts ¶ 7. Chladni's argument is therefore rejected and does not invalidate her prior express consent to the University on June 22, 2015.[4]

---

[4] The University's records indicate that Chladni also had contact with the University on November 22, 2011, when she expressed an interest in the Bachelor of Science, Psychology Program. *See* Ex. A, ECF No. 22-5. These records state that Chladni gave express written consent at that time to be contacted by the University. *Id.* However, at her deposition, Chladni denied requesting information from the University in 2011. Pl.'s Dep. 18:20-19:7.

Chladni argues that there is a genuine dispute of material fact as to whether she provided prior express consent in November 2011. She contends that the University argued in its brief that she gave consent in 2011, but failed to include this allegation in its statement of facts or to prove this affirmative defense.

Contrary to Chladni's allegations, the University does not assert in its Motion for Summary Judgment that she gave prior express consent in 2011 to place the autodialed calls in 2015. Rather, the University relies solely on the June 22, 2015 consent. *See* Def.'s Mem. Supp. Summ. J. 1-5, 7-9. Accordingly, this Court finds that the undisputed evidence establishes only that Chladni gave prior express consent on June 22, 2015.

### C. There is a genuine dispute of material fact as to whether the University called Chladni before she gave express consent on June 22, 2015.

Chladni asserts that there is a genuine issue of material fact as to whether the University called her prior to June 22, 2015, when she first gave express consent to be contacted. At her deposition, Chladni testified that she received autodialed calls from the University, from different telephone numbers, on her cell phone "as frequently as five to six times a day between May and June of 2015," and that she repeatedly asked the University to stop calling her. Chladni has furnished a declaration that essentially reiterates these assertions. *See* Chladni's Decl., ECF No. 23-4.[5]

The University replies that Chladni has offered no evidence to support her version of the facts, which it claims has changed over time and differs from the allegations in the Complaint. The University comments, for example, that Chladni alleged in her Complaint that she never gave the University her telephone number or consent to call her, but that she has since admitted to providing her information to the University and checking the consent box when she submitted her job application online. It therefore submits that there is no genuine dispute precluding the entry of summary judgment. Additionally, as for Chladni's deposition testimony and declaration, the University contends that her version of the events is contradicted in at least three respects by other evidence. The University argues that in light of this evidence, no reasonable

---

[5] The University asks this Court to disregard Chladni's declaration because it contradicts and/or supplements her earlier deposition testimony. Def.'s Reply 3-4 n.1 (citing *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991) ("When, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists.")). However, the University cites to this declaration as additional grounds to grant its Motion for Summary Judgment. *See id.* at 3, 5-8 (commenting on Chladni's ever-changing version of events). Consistent with *Hackman*, this Court will not completely disregard Chladni's declaration; however, it is insufficient in itself to create a genuine issue of material fact.

jury could believe her testimony and this Court need not accept her testimony as true for purposes of deciding this motion.

First, the University argues that Chladni's claim that she never visited its website is contradicted by the record evidence. To support this claim, the University cites to the declaration of its Vice-President of Reporting and Analytics Services. His declaration states that the University's records indicate that a computer with an internet protocol address, which was admittedly used by Chladni, accessed its website on June 22, 2015. Rigler Decl. ¶¶ 4-7. The University asserts that Chladni's testimony on this point is vague because she does not remember which website she used to submit her job application, and that she has provided inconsistent statements about the list of possible job websites. *Compare* Chladni Dep. 38:15-19 (listing the sites she used to submit job applications as "Monster, Indeed, CareerLink. That's about it."), *with* Chladni Decl. ¶ 17 (stating that Chladni was "looking for a job on Monster, Indeed, CareerBuilder, and other job websites in the spring and summer of 2015")). The University further argues that this testimony is contradicted by the information provided by a Marketing Operations Analyst for the University's parent company, who stated that the University did not advertise on Indeed, CareerLink, or CareerBuilder in May or June 2015. Saavedra Decl. ¶ 4, ECF No. 24-1.

Second, the University challenges Chladni's testimony that she had no option but to check the consent box when she submitted her job application online. According to the University, all of its digital marketing contained at least one way for a user to opt-out of the University's offer to contact the user with further information. Saavedra Decl. ¶¶ 6-7 & Ex. A, ECF No. 24-1 (containing a "screenshot of the monstor.com offer as it existed in May 2015").

9

Third, the University argues that its call records and Chladni's own telephone records contradict her claim that the University called her an average of five to six times a day during May and June 2015. *See* Rigler Decl. ¶ 10 & Ex. B, ECF No. 22-5; Chladni Dep. Ex. D-2. The declaration of the University's Vice-President of Reporting and Analytics Services states that the University's autodialed calls originated from only one telephone number during May and June 2015, Rigler Decl. ¶ 10, which appears on Chladni's telephone records only between June 22 and June 24, 2015, *see* Chladni Dep. Ex. D-2. The records show seven incoming calls from this number to Chladni's cell phone, but the University has indicated that one additional incoming call, in which the calling party number is shown as "0" on the telephone records, is also from the University. *Cf. id.*, *with* Rigler Dec. ¶¶ 10-11 (stating that the University, using only one telephone number, placed seven calls to Chladni using the Avaya Proactive Contact system and one call using the Avaya Communications Manager system). Aside from these calls, Chladni could not identify a single telephone number on her telephone records prior to June 22, 2015, that she believed had originated from the University, despite her testimony that the University had called her an average of at least five times per day on multiple days during May and June 2015. Chladni's Dep. 91:6-92:24; Def.'s Stmt. Facts ¶¶ 27, 30-31, *admitted in* Chladni's Stmt. Facts ¶¶ 27, 30-31. Chladni was also unable to identify the call that she alleges she had with the University in early May 2015 during which she advised it to stop calling her, nor was she able to identify any other calls prior to June 24, 2015, during which she alleges that she asked the University to stop calling. Chladni's Dep. 47:16-58:11; Chladni's Stmt. Facts ¶ 17. On the other hand, the University produced recordings from three telephone calls, which it alleges are the only calls in which voice-to-voice contact was made, and that it was only during the third call, on

June 24, 2015, that Chladni asked the University not to contact her again. Def.'s Stmt. Facts ¶¶ 13-17; Rigler Decl. ¶¶ 14-17 & Exs. D, E, and F.[6]

After reviewing the evidence, this Court cannot conclude that Chladni's testimony "is blatantly contradicted by the record, so that no reasonable jury could believe it." *See Scott*, 550 U.S. at 380. First, contrary to the University's argument, Chladni's testimony that she never visited the University's website is not contradicted by two separate declarations. The declaration from the Marketing Operations Analyst for the University's parent company does not conflict with Chladni's because it confirms that the University advertised on at least one of the websites that Chladni testified she may have used to submit her job application. On the other hand, the declaration of the University's Vice-President of Reporting and Analytics Services, which cites to internal records showing the internet protocol address of the computer used to access its site, is contradictory. Nevertheless, considering Chladni's testimony that she could not remember what website she used to submit her application on June 22, 2015, and that she submitted a lot of job applications during this time period, *see* Chladni Dep. 37:23-40:17, a reasonable jury could find that she simply forgot that she accessed the University's website without discrediting her testimony completely. *See Cincinnati Ins. Co. v. Drenocky*, No. 1:15-CV-762, 2016 U.S. Dist. LEXIS 87711, at *17-18 (M.D. Pa. July 7, 2016) (contrasting the facts in *Allstate*, where the court granted summary judgment despite inconsistent stories because it found that no reasonable jury could have believed the claimant forgot that he was a smoker or that there were others renting rooms in his house, and finding that a reasonable jury could determine that Drenocky simply forgot about a letter warning him of installation problems with the subject window

---

[6] Because Exhibits D, E, and F are audio recording they were not filed on ECF; however, at the time the University filed its Motion for Summary Judgment, it provided this Court with a USB drive containing the three audio recordings.

(discussing *Allstate Ins. Co. v. Kelly*, No. 3:05-276, 2007 U.S. Dist. LEXIS 7316 (W.D. Pa. Jan. 31, 2007)).

Second, the University has not shown that Chladni's testimony, that she had no option but to check the consent box on the online job application form, is contradicted by the record. On this point, the University again relies upon the declaration of its Marketing Operations Analyst, who stated that all of the University's digital marketing contained an opt-out option. But, the screenshot attached to the Analyst's declaration does not depict the same form the University alleges was submitted by Chladni, as the consent language on each is different. While the opt-out box on the screenshot is obvious, there is no way to tell, other than from Chladni's testimony, whether the opt-out method on the form she submitted was equally clear. Therefore, the record evidence does not squarely contradict Chladni's testimony.

Third, with respect to Chladni's recollection of the number and timing of telephone calls that she received, the University again claims that the declaration of its Vice-President of Reporting and Analytics Services contradicts her testimony. He attested that the University used only one telephone number to contact students in Chladni's area code in May and June 2015, which does not appear on Chladni's telephone records prior to June 22, 2015. This, however, is simply a dispute over the competing credibility of two witnesses and should generally not be resolved by the court on summary judgment. *See Kreimer v. Bureau of Police*, 958 F.2d 1242, 1250 (3d Cir. 1992) (holding that it is only where the non-moving party's evidence is "too incredible to be believed by reasonable minds" that a court should resolve a credibility issue on summary judgment (quoting *Losch v. Parkesburg*, 736 F.2d 903, 909 (3d Cir. 1984); 6 J. Moore, Moore's Federal Practice para. 56.15(4), at 56-524 (2d ed. 1976))). A declaration from an employee of the University is not the type of "incontrovertible proof" that requires this Court not

to accept Chladni's version of the facts as true. *See Santiago v. Fields*, No. 05-CV-4884, 2009 U.S. Dist. LEXIS 21265, at *17-18 (E.D. Pa. Mar. 12, 2009) (determining that "this is not a case where Defendants have presented incontrovertible proof that their version of the facts is the correct version"). While the University also produced business records showing seven telephone calls to Chladni, these records are limited to calls it placed using the Avaya Proactive Contact system. The University admits that it placed one additional call to Chladni using the Avaya Communications Manager system, but these records are not in evidence. Accordingly, this evidence, which does not eliminate the possibility that the University placed calls using a third autodialing system, does not contradict Chladni's testimony. Similarly, Chladni's telephone records do not eliminate the possibility that the University called her from more than one telephone number. Chladni testified that the University called her an average of five to six times a day during May and June 2015 from more than one telephone number, but that she could not recall which numbers in her telephone records belonged to the University. Consistent with this testimony, the telephone records show that there are several days in which Chladni received more than five calls from multiple telephone numbers. In the absence of evidence identifying the owner of each telephone number, a jury would not be compelled to reject Chladni's account.

      Accordingly, of the evidence the University suggests contradicts Chladni's testimony, only the declaration of its Vice-President of Reporting and Analytics Services and the business records showing the internet protocol address that was used to access the University's website on June 22, 2015, are actually contradictory. However, considering this evidence, along with the other allegedly inconsistent evidence cited by the University, this Court does not find it so

overwhelming that no reasonable jury could disbelieve it. *Cf. Scott*, 550 U.S. at 374-86.[7] Consequently, there are genuine issues of material fact precluding the entry of summary judgment.

## IV. CONCLUSION

The undisputed evidence establishes that on June 22, 2015, Chladni gave the University express consent to place autodialed calls to her cellular telephone, and that she revoked this consent on June 24, 2015. However, there is a genuine issue of material fact as to whether the University contacted Chladni prior to June 22, 2015. The Motion for Summary judgment is therefore denied. The Clerk of Court is directed to reschedule the arbitration trial.

A separate Order will be issued.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

---

[7] In *Scott*, the United States Supreme Court determined that despite the contradictory versions of the events, a police officer was entitled to summary judgment in his favor for his alleged use of excessive force and unreasonable seizure. *See Scott*, 550 U.S. 372. The case arose following the officer's pursuit of a fleeing motorist during which he decided to force the fleeing vehicle off the road, which caused the driver to crash and suffer injuries that rendered him a quadriplegic. *Id.* at 374-75. According to the fleeing driver, he remained in control of his vehicle throughout the pursuit, slowed for turns and intersections, used turn signals, did not run any other motorists off the road, and did not pose a threat to pedestrians in his path. *Id.* at 379. But, the Supreme Court concluded that videotape evidence told "quite a different story." *Id.* The Court stated, "what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id.* at 380. The video showed the fleeing motorist racing down narrow roads at night at shockingly fast speeds, swerving to miss more than a dozen other cars, forcing other vehicles onto the shoulder, and running multiple red lights. *Id.* at 379-80. The Court concluded that the driver's "version of events [was] so utterly discredited by the record that no reasonable jury could have believed him." *Id.* at 380.